Thank you, Your Honor. May it please the Court, Matt Malmesheimer on behalf of Appellant Jennifer Rieman. I would like to reserve five minutes of my time for rebuttal. The first thing I'd like to do is focus on what is the central disputed issue of material fact in this case, and that is what was the motive for Evraz's termination of Ms. Rieman's employment? Was it as defendant contends, simply with theories of unprotected absences, or was it as Ms. Rieman contends, and as her evidence supports, the result of her taking extensive amounts of protected family leave in order to deal with her own medical conditions and the birth of her child? The District Court didn't address that central disputed material fact, the motive, because the District Court and defendant make a number of legal errors that didn't get to that question. The first legal error is this sort of assumption that without protected leave, there is no protection of Oregon's Family Leave Act. That's simply false. One doesn't need to have protected leave in order to be entitled to protection from adverse employment actions being taken on account of availing that leave, invoking the provisions of OFLA, or taking family leave. That's simply not a requirement. That's expressly stated in the Yeager case, and it only makes perfect sense because without that general principle, the minute somebody ran out of leave, the employer could terminate them and do so if we take defendant's position to its logical end, expressly stating you took all that leave, you're fired. To the extent you're referring to the later period when she took the leave, I thought everybody assumed initially that she had leave, that she was eligible for leave. Yes, Your Honor, she was eligible. And then it turned out later that they discovered that she didn't have enough hours in for the prior year. There was a significant question around that. When she first availed herself of that leave, she was under the impression because of the work that she had done over her lunch breaks, coming in early, staying late on other days, that she had made up that time. As it turned out, the way her manager reported time to the standard who administered the leave, they just put a block eight hours in, or she was absent. So those additional hours that she made up were never recorded. That was the central... Well, there's a dispute about that, whether she could have done that. But let me ask you this. Yes. So as I understand it, under OFLA, that to the extent leave under the act is a factor in an adverse action against an employee, and here it's termination. That's all the petitioner or the plaintiff needs to show. That's correct, Your Honor. Is that right? Just if it's a factor in the determination. That's correct. So the district court said, well, there's some evidence here, but it's extremely minor. And what evidence is it that shows that there's a genuine factual dispute over whether or that her taking a family leave over an extended period of time was a factor in the termination decision? And I'll explain that, Your Honor. There's a significant amount of evidence in that regard. The first is expressed hostility from Everett's management regarding Ms. Ringman's absences. That was stated expressly by Scott Hawkins, one of Ms. Ringman's managers, because he was tired of dealing with it. And others in the office who over the course of time had made negative comments about Ms. Ringman's use of leave. That backdrop prior to her taking leave, people in the office made negative comments about why she was leaving the office and her managers as Ms. Ringman testified. When you say people in the office, that's pretty general. Who are you referring to? And what were the statements made? Well, Your Honor, one of the people who specifically spoke to her was a co-worker. And I'm forgetting his name at the moment. It is in the record. But he would regularly say, oh, that's right. You have to leave early. He would show up with some kind of assignment and say regularly. Did he say more than once? Is the record established that it was said more than once? And is that attributable to the company if it's a co-worker or somebody of equal status? Well, Your Honor, it's attributed to the company in this sense. What it shows is a culture and background at the workplace that does not respect that. And that's further verified by her managers not letting her take the six-hour block that her doctor was given during pregnancy by forcing her to do additional tasks, by coming to her with additional tasks at the end of the day and insisting that she do them rather than leaving at the time that she was supposed to. Now, those are all so vague. In your papers, they're vague. They're just conclusions. And I'm looking for something more specific. So going back to the statement by the co-worker, when was that statement made in relation to the termination? Your Honor, those statements were made prior to her pregnancy while she was on a limited status with her physician. And so in terms of the termination, that's six months. But that's not the only evidence standing alone. And the important thing in these cases is that whether or not that was a motivating factor has to be taken into consideration of all of the evidence, the context in which the statements are made, the potential motive behind those statements, what happened subsequently, and how matters were handled by the employer. In addition to that background that I've just described... Well, going to how it was handled by the employer, was there ever any... Didn't they accommodate her request? I mean, I know Mr. Woodward, I think it was his name, initially would not alter her work schedule. But then as soon as it was brought to the attention of HR, they fixed it. Correct. They paid her and she got all the leave to which she was entitled. Is that right? That is accurate, Your Honor. But what I want to point out there is what Mr. Woodward and upper level management shows is the disjunct between the corporate headquarters in Chicago and the people on the ground in Portland. And the problem was that the people on the ground in Portland, as Scott Hawkins stated, were tired of dealing with Ms. Green's leave. She had taken significant... What was that comment specifically addressing? That they were tired of dealing with it? What was it? Her ask. What request was it? Well, was it leave? Was it that she asked for leave? Was she on protected leave when that statement was made? Or was it she had exhausted her protective leave? That was after she had returned to the office, Your Honor. No. So what was it referring to? Taking protective leave or unprotected absence? Your Honor, given that the comment was made after a short number of absences, a reasonable juror could conclude that it meant the entirety of her absences. So you're not answering my question. You don't know what it was referring to, but there were unprotected absences by the time that comment was made. Is that right? That's correct, Your Honor. But the thing is, the jurors could find that in the defendant's favor, and I'm certain that's how defendants portray that. The juror could also find, as the district court was required to find, that that included a long series of absences before the small number of absences that immediately preceded that comment. Additionally, other issues that were raised that demonstrate evidence from which a juror could conclude that this was retaliatory, ever as its failure to follow its own policy in regard to how to handle the termination. That policy is critical to this case because it's at ER 130, and it provides for, first, an oral warning, which Ms. Riemann got. Second, a written warning, which Ms. Riemann got. But in addition to that... But doesn't that assume that she's still working? I mean, when they terminated her, she had pretty much left the job. She stopped calling in. That's not true, Your Honor. What had happened was she had called in and said, I'm going to be absent for a number of days, and the employer simply said, well, let's wait. They ignored that. They destroyed the voicemail message where Ms. Riemann called in and said, I'm not going to be there, and then they terminated her, saying it was a no-go. They did not follow... Then what is there in the record that prompted her to call in and say, I want to talk to you about my termination? Because she saw the writing on the wall, Your Honor. She understood where this was going. She knew exactly what Everest wanted to do and where things were headed. Just because she recognized that in real time doesn't make their actions any more lawful. It's still an illegal termination, given that the motive for it was her significant use of protected leave prior to this. Well, you used motive, but really, was it a factor? Correct, Your Honor. Was it taken as a negative factor in the consideration of her termination? Who made the decision to terminate her? That was a joint decision made by Zach Lucas and Alison Hicks, who's the HR department. Those are the two individuals that spoke with Ms. Riemann on the phone. Those were the individuals who were involved in the final area, and Alison Hicks was behind not only failing to follow the policy and coming up with the concocted... Let me ask you this. What is an employer to do when an employee has had extensive family leave time off, uses all that they've accumulated, and then still insists on taking family time off? Employer's supposed to say, okay, that's fine. Go ahead. Your Honor, I would say it depends on the employer. An employer that decides, no, we're not going to tolerate that under the law can certainly not tolerate that. An employer that says, well, we can tolerate some of this, but not a lot, then they're free to do so. An employer that's willing to indulge that kind of leave is likewise free to do so. The problem is here, this was a permissive policy that could have been followed in order to get to a point where they found out, hey, look, with Ms. Riemann, all we have to do is accommodate some meetings here, let her work a little bit different shift here, let this be different, which was fully within its own policy, and they did not do so. Instead, they just fired her. Now, let me ask you this. I have one other kind of technical question. She asked for permission to start her workday an hour earlier, and ended an hour earlier. Is that considered family time off, or is that just an employer saying, well, our work hours are generally nine to five, but we're going to let you work eight to four, or seven to three, or whatever it might be? I mean... I think that would be a flexible issue with the employer. I don't believe that constitutes... That doesn't have anything to do with the family leave, does it? No, sir. It's not because there's no leave taken. All of that time is done. It's just at a different time, and typically leave, my understanding is if somebody needed two hours off at the beginning of the day, and just took that time off, certainly that would be leave. They moved the schedule. That's just flexible scheduling. It can be an accommodation under the American with Disabilities Act, but not leave, Your Honor. Okay. Do you want to save some time for rebuttal? I would. Thank you. Okay. May it please the Court. Good morning, Your Honor. James Barrett for Respondent Everest. I guess I wanted to start my response just by quoting from Bockelder, which is this court's decision that guided the district court below, and is cited by both parties. And that quote is, and the court stated in that case, it should be obvious that the FMLA is not implicated, and does not protect an employee against disciplinary action based on absences, if those absences are not taken for one of those reasons enumerated in the act. And we have those obvious circumstances here. I would submit to the court that family attendance policy cases as a species of FMLA cases are particularly difficult for plaintiffs, especially when there's no dispute as to whether the absence is being disciplined or protected or not. There is no dispute here. She was being disciplined for unprotected absences. This court has recognized in several cases, including those cited in the briefs Hooker from 2013 and Trujillo in 2009, that attendance infractions constitute non-retaliatory, non-discriminatory reasons for terminating employment. So timing does very little work. It doesn't help plaintiffs in these kinds of attendance policy cases, because of course, the minute that an employee exhausts their protected leave, the employer has the right to then apply the attendance policy. And so in these attendance policy cases, what it really comes down to is whether plaintiffs can show that employer applied its policy inconsistently, such that there could be an inference drawn from a jury that there was some that the protected leave was a factor. And what one would look for as evidence of inconsistency is evidence that someone who did not take protected leave was treated more favorably. That, for example, the employer let absences slide for employees who did not take protected leave and only disciplined employees who did take leave, or as her alternative theory in this case, only disciplined women who took leave. But you need a comparator evidence and as in Harper in the Seventh Circuit case cited in the brief, the employee is terminated under an attendance policy, a meaningful comparison only may be made by identifying those employees who received more favorable treatment. Does Oregon law, let me ask you this, does Oregon law or analysis in these family leave act cases? It does not, Your Honor. And I don't mean to suggest... It could be helpful evidence if the employee could find that. It would be compelling evidence. It would be the kind of, it would be the most relevant evidence because of course it wouldn't, I don't mean to suggest it's the only evidence where the comparator evidence is required, but without comparator evidence, you would need some other type of evidence to show that factor. And Plaintiff has put forward some of that evidence, which I will turn to shortly. But I just want to make clear that the main premise of Riemann's case here is a suggestion of what Everest did in this case was apply its attendance policy to her differently. And the main thrust of Everest's response on appeal and what the record that she was treated differently. There were a hundred people disciplined under this policy in the years preceding her termination, nine terminated. There's no suggestion that they were disproportionately women or disproportionately people on protective leave. That doesn't mean that in her case it could have been, you know, she took extensive family leave act time over a period of years that is, you know, they could have just gotten tired of it, you know. We're just tired of having to grant you all this time off and, you know, research. I understand your argument or your statement, your honor, but you would still have to understand, you still have to know or want, there would have to be some evidence that the way in which they applied their attendance policy deviated for the norm. So regardless of whether they were tired of it or not, as someone who takes. What is it, let me ask, let me get a little bit deeper. What does it mean under the case law that what the employee has to show is that taking medical, taking family time out was a factor, a negative factor in the decision to look at circumstantial evidence of intent, just as it would in any discrimination case. So the kinds of negative comments that plaintiff has alluded to in his effort to show that there was a culture of hostility towards individuals who took leave. But again, you would still want to know. What if it's just, what if they're just so tired of this one person who's taking so much time? Can I address that? We're just tired of you, right? I'd like to address that argument specifically. So that's one of the two arguments remaining is there's in page two of the reply brief by Ms. Riemann and you heard him say it in oral argument. He cites to the fact that after a long series of protected absences, I'm reading from the brief and schedule accommodations to allow Ms. Riemann to care for herself and her family. Everest management in the Portland regional office grew to resent Ms. Riemann's use of protected leave and had in management's words ground quote tired of dealing with it. Okay. There's no context to that statement. Riemann does not say who said it or who said it or when it was said or who in management was saying it. And judge Antune, you questioned the appellee on this very closely. The citation is to page two 11 of the excerpt of record. If you look at page two 11, it turns out that the I'm tired of dealing with it is a statement made by Scott Hawkins with respect at the end of August, 2015, with respect to very specific absences in August that were unprotected. He's tired of dealing with unprotected absences. There were five and that those five are referenced on excerpts of record 2012. And then those are the absences that made its way into the sit down with Ms. Riemann for counseling. You can see that in evidence of record 38 and she has told about these absences in evidence of record 104. Can I just interject one question right there? Were those the absences that she thought she was still entitled to take under the under the act? Unclear, but let me make this point, your honor. There's no dispute that Everest didn't thought that she might have protected leaves. And in fact, when she was sat down and disciplined on October 15 and shown all of the absences that ever has believed were unprotected, and that's an evidence of record 104. That's what prompted Ms. Riemann to then contact the standard and say, are any of these protected? And the answer was no, that's in the record. And so it was, in other words, when Riemann put in a brief and was arguing to the court that management was tired of it with respect to unprotected absences, that's not supported by the record. And with respect to these other negative comments, the insensitive remarks about her family members, which were attributed to unnamed coworkers in management, it were five years old. There's no nexus. And your honor, to answer your question, and I guess this is Judge Paez about whether it has to be, you have to show comparator evidence. Well, no, not strictly speaking. But if you're going to try to bring in comments showing a culture of hostility, there has to be under this court's case law, a nexus, France v. Johnston and Vasquez v. County of Los Angeles. In other words, Mr. Woodard, if he did something or said something that Ms. Riemann perceived as negative or hostile towards her use of family leave, if it happened two years ago or three or four or five years ago, and if Mr. Woodard wasn't even involved in the decision to apply the attendance policy, there's zero nexus. It does no work. And that's true for all of the comments that were brought in down below. And as the district court properly ruled, they don't move the needle. There's a comment by Lance Richards saying, oh, that's right, you need leave. But Mr. Richards was never a supervisor, not involved in the application of the attendance policy in 2015. And you have, that's the same problem that the district court found with the declaration of. Can I ask you just one question to clarify the context as you refer to it? With reference to Mr. Scott Hawkins and his email. Correct. Of Monday, August 31, 2015. Correct. And he says, he's writing to Sharon and Allison, whoever they may be. We really need to come up with a productive solution to adequately cover the desk. As Steve mentioned below, she, meaning the plaintiff, has returned to work performance. Since she has returned, her work performance has been fine. However, it does no good if you're not here Correct, your honor. How does that fit into the analysis? So if you go to the next page, what Scott Hawkins is responding to is a report about the fact that since the switch from, I'm reading from evidence of record 2012, since the switch from Amber to Jennifer in the ISR for the Gulf region, today makes the fifth day that Jennifer has been absent. So Scott Hawkins is looking for a solution to this problem of her pattern of absences. These absences then combine with later absences and get rolled up into a counseling session on October 15, where there are, I believe, somewhere on the order of 14 absences that she's counseled about. Was it known to Steve Mize and Scott Hawkins at that time that her absences were not protected? I don't know that that's in the record, your honor, as to what they believed one way or the other. But by the time they got to the October 15 sit down, HR was involved. I mean, this was a process. And she was counseled, and she wasn't given points for all of those absences. She's only given points for some of them. And she was told very clearly, you need to start coming to work on time. And when you're scheduled to work, there's no dispute, your honor, that these absences at that point in time were not protected. And she was given a lot of room. But immediately, she was then given a written counseling at the end of October of 31, very clearly stating, if you continue these absences, you're going to be terminated. And immediately following that, she was absent again. And I want to address the last point that counsel raised, the failure to whatsoever, zero evidence that Evraz was not following its policy the way it followed it with everybody else. It gets back to the comparator problem. It's not required, but without it, how do you sit here and say that Evraz wasn't following its policy? Where's the person who was allowed eight absences in a row, who called in on Monday and told their termination, and then didn't call, and then didn't call for the next four days? Where's the individual who Evraz allowed that to happen, and they didn't terminate? I mean, that's the critical question here. You have a neutral policy, no evidence that is being applied in an unneutral way. Mr. Barrett, before your time expires, I want to ask one more question. I'm just trying to get the sequence of events straight in my mind. There was a complaint or complaints made by customers about the plaintiff not being available, right? Correct. When were those complaints made in relationship to the comment, I think by Mr. Hawkins, that he was tired of it? I believe that was a, and I believe, Your Honor, and this is evidence in the record, it is a footnote in my brief, but I believe it's years. In other words, so she had a five-year, about a six-year employment history, and they moved a customer from her. She wasn't adversely affected in terms of her position or pay, but because of the hour she was frustrating to the client, so they moved that client to someone else. That happened approximately two years before the application of the attendance policy. And again, anything surrounding that, if there had been a negative comment around that, like, geez, you shouldn't have your customers moved or whatever, what's the nexus between its application of the attendance policy? And I see my time is expiring. If there are any questions, I'm happy to answer. I don't see any more questions. I think council had about a minute and a half for rebuttal. Go ahead. Thank you, Your Honor. I'd like to just address a couple of quick points. One, this idea that somehow the hundred other employees that were disciplined and nine that were terminated show that it wasn't being, their policy wasn't being improperly or not followed in this instance. That's simply, there's no way to determine that. There's no evidence about any of the details regarding those other employees. So that's off the table. If they wanted to have that kind of comparator evidence, they could fully have presented it. They didn't. They simply put some numbers up that tell you nothing about the circumstances. The other thing is you can just look at the policy. There were two steps that she was entitled to. And even, I really would urge the at the final stage, when somebody has had a last chance agreement and failed to comply with it, termination is not mandated. It's a possibility. And before that happens, what is supposed to happen is that offsite management, the folks in Chicago who are overseeing this, who already corrected Portland once when it was violating this right, sits down and meets with the employee to determine, hey, what's going on? What is it? Why are you missing these days? What's happening here? What can we do to make it so that you can be there? That's on its terms, not been followed in this case. And if what they're saying is this alternative theory, well, they had this catch-all below. If that was the case, why didn't they just use that to begin with? It begs the question, why did they use this no-call, no-show provision at all? Okay. It was just about the catch-all policy covers everything. We argue that it doesn't. But if that was the case, why wouldn't they just go out that door? All of that. Here's a question. You're over your time. But I have one last question I want to ask you. And, Murfitts, it's something you said in your opening argument. Yes, Your Honor. You said that she called in. Yes, Your Honor. To report her absence and that they erased the call. We don't know exactly what happened. Is there evidence in the record to support that statement? There's an absence of the recording. It's not been preserved. Ms. Riemann called Allison Hicks, the HR supervisor, in order to tell her that she wouldn't be there for the next two days. Does Ms. Hicks confirm that? Did Ms. Hicks say, yes, I received a call from Riemann? He does not, Your Honor. That's a disputed issue of fact. And that was recognized by the district court as a disputed issue of fact because Ms. Hicks claims that she didn't get any such message. So there's no evidence that it was erased? The only evidence that we have is that it was not preserved. The only conclusion that I can the other reasons for that. Well, it could have been recorded over as part of the process because sometimes those recordings just regenerate rather than keeping them forever. They're taped over sometimes. So that's not the only explanation. And I agree, Your Honor. There are other possible explanations. The reason I believe it was erased is because Ms. Hicks, in a subsequent phone call with Mr. Lucas on the line, claimed that she had received any such message, which makes me think she had reason to get rid of it. Okay. That she didn't have to go through this call. All right. Okay. Thank you, counsel. We appreciate your argument this morning. And the matter is submitted at this time. Thank you.
judges: Paez, Rawlinson, Antoon